IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| MARY A. KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CV-056 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claims for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. For the reasons set forth herein, defendant's motion for summary judgment [doc. 19] will be granted, and plaintiff's motion for summary judgment [doc. 11] will be denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

Plaintiff applied for SSI benefits in August 2002, claiming to be disabled by "bi-polar and other mental disorders, diabetes, pinched nerve in back." [Tr. 54, 63]. Plaintiff alleged a disability onset date of February 10, 2002. [Tr. 63]. Her application was denied

initially and on reconsideration. Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on June 3, 2004.

On July 30, 2004, the ALJ issued a decision denying benefits. He determined, in relevant part, that plaintiff has "affective and anxiety disorders," which are "severe" impairments but not equivalent to any impairment listed by the Commissioner. [Tr. 15]. Noting that plaintiff's subjective complaints were "not considered fully credible[,]" the ALJ concluded that plaintiff retained the residual functional capacity to perform a significant number of medium, light, and sedentary jobs existing in the economy. [Tr. 18-20]. Plaintiff was therefore found not to be eligible for SSI benefits.

Plaintiff then sought review from the Commissioner's Appeals Council. On December 19, 2005, review was denied. [Tr. 5]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. § 416.1481. Through her timely complaint, plaintiff has properly brought her case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Background and Testimony*

Plaintiff was born in 1979. She was in state custody from ages thirteen to seventeen, moving "from group home to group home" due to "her violent behavior." [Tr. 218, 371]. Plaintiff attended school into either the seventh, eighth, or ninth grade. [Tr. 218, 371, 391].

Plaintiff is obese and "consistently noncompliant with . . . diabetic management." [Tr. 146, 149, 152, 154, 156, 158, 162, 175, 261-62, 267, 304, 347, 378, 380]. She purports to also suffer from "major depression," panic attacks, "intermittent explosive disorder," constant worry, and back pain [Tr. 374-75, 381] and therefore allegedly "Can't concentrate, can't deal with people, can't bend, lift or carry. Can't stand long." [Tr. 54]. Past jobs include fast food worker, cashier, waitress, and grocery bagger. [Tr. 102, 138, 375-78].

Plaintiff testified that "I can't go anywhere for fear of having panic attacks. I don't go anywhere, I don't do anything." [Tr. 385].[1] However, plaintiff is able to attend church three times per week for two hours at a time [Tr. 393] and visit her "active alcoholic" mother once or twice monthly to swim and "party." [Tr. 97-98, 218, 220]. Plaintiff is further admittedly able to: grocery shop daily; prepare a grocery list; identify and "always buy the cheapest" item; cook "everything" "everyday"; wash dishes daily; sweep floors daily; dust; mop, vacuum; walk a half-mile per day; and "bleach counters, tub, sink, [and] lanolium [sic] floors" daily. [Tr. 91, 96-97, 392-93]. She performs these tasks without assistance, needing help only in making the bed because "It's hard for me to bend over and get the top corner of the bed." [Tr. 97].

The administrative record documents a history of violence by plaintiff against others [Tr. 151, 154, 218-19, 325], up to and including violating a protective order [Tr. 218],

---

[1] Plaintiff elsewhere testified that the reason she does not "go anywhere" or "do anything" is actually "[b]ecause I don't have any friends." [Tr. 388].

3

"always" abusing animals [Tr. 276], stabbing a boyfriend [Tr. 327], threatening arson [Tr. 293], and attempting to smother two children with a pillow. [Tr. 276]. The record also contains a number of reports produced by the Indiana Family & Social Services Administration, pertaining to plaintiff's teenage years. These records document a history of depression, minimal social skills, near-average intelligence, feelings of abandonment, and a "very poor" prognosis. [Tr. 264, 268, 271-72, 291]. These records also document, however: that plaintiff was viewed as capable of making "wise decisions if she applies herself and stays focused on remaining positive" [Tr. 255]; that plaintiff was described by two social workers as being someone who "lies constantly" [Tr. 273]; that counselors have expressed "reservations over the accuracy of her reporting" [Tr. 260]; that the clinical director of Crossroad Children's Home described plaintiff as "very creative . . . has clear artistic ability . . . . bright, insightful, and capable when she sets her mind to making efforts toward success" [Tr. 297]; that plaintiff admittedly "purposely 'messes up' at times to stay in [the] system" [Tr. 310]; and that plaintiff could have acquired her GED but for her "ongoing laziness and resistance." [Tr. 302].

### III.

*Relevant Medical Evidence and Opinions*

#### A. Physical

Plaintiff began treatment at the Knox County Health Department in late 2000, requesting medication for diabetes, depression, and bipolar disorder. [Tr. 162]. R.N.

Richard Henighan provided plaintiff with medication and supplies. Plaintiff denied any illegal drug use currently or in the past. [Tr. 162]. However, a drug screen one month later returned as "high positive" for marijuana. [Tr. 172]. In June 2001, nurse Henighan noted plaintiff's self-report that "[s]he has been taking her meds she says, for both blood pressure and diabetes." [Tr. 148]. Nine months later, however, plaintiff informed health department doctor Savita Mistry that "[s]he never took the [diabetes] medication, but never admitted not been taking [sic] to Richard Henighan." [Tr.149].

Dr. Jeffrey Summers performed consultative physical examinations in September 2002 and January 2003. Plaintiff reported dull, aching lower back pain and stiffness of two years duration. [Tr. 176, 242]. At the first evaluation, plaintiff told Dr. Summers that "a chiropractor" previously diagnosed her with "a pinched nerve." [Tr. 176]. At the second evaluation, plaintiff reported that "an unknown physician" had given her "an unknown diagnosis." [Tr. 242]. Dr. Summers's examinations showed "a mild kyphoscoliosis deformity," and lumbar x-rays revealed "mild" reactive sclerosis and "mild" degenerative changes. [Tr. 176-77, 242]. Dr. Summers concluded that "she has a mild-moderate decrease in range of motion at her lumbar spine. This will affect her ability to bend, stoop, and lift greater than 20 lbs. She should tolerate all other work related activities in this regard." [Tr. 178, 242-43].

In February 2003, Dr. Robert Burr reviewed plaintiff's administrative file and predicted that she could lift up to 50 pounds occasionally and 25 pounds frequently. [Tr.

245]. Dr. Burr opined that plaintiff could sit and stand/walk approximately six hours each per workday, with no further limitations predicted. [Tr. 245-51].

At her administrative hearing, plaintiff testified that she is now being treated by Dr. Fred Bennett for her "constant" and "shooting" back pain. [Tr. 382]. Plaintiff testified that Dr. Bennett has prescribed pain medication which causes drowsiness. [Tr. 382]. The record documents two visits to Dr. Bennett. At the first of these appointments, plaintiff reported chronic headaches and musculoskeletal pain exacerbated by an arrest. [Tr. 339] ("States she was arrested + police threw her against cell - hit head."). A CT scan of the head was "negative." [Tr. 344]. A concern was noted that plaintiff may be "drug seeking" [Tr. 339], and at the follow-up appointment Dr. Bennett wrote that he "will discontinue patient if continues to ask for narcotics." [Tr. 337].

## B. Mental

In July 2001, plaintiff told nurse Henighan that "she is not having any acute problems with anxiety or depression issues." [Tr. 146]. In May 2002, she "denie[d] being depressed" to Dr. Mistry. [Tr. 143]. In late 2002, plaintiff was treated by Cherokee Health Systems, "presenting issues includ[ing] panic attacks, mood lability, interpersonal difficulties, anger management problems, ruminative worry, depression, and suicidal ideations." [Tr. 214].

Clinical psychologist Brian Humphreys performed a consultative examination in December 2002. Dr. Humphreys noted that plaintiff "was cooperative at all times and was

6

never hostile with the interviewer." [Tr. 217]. Plaintiff told Dr. Humphreys that "she has been fired from all of her jobs . . . either because of her hostile behavior or her not catching on quickly enough to what she was expected to do." [Tr. 219]. Specifically, plaintiff told Dr. Humphreys that she was fired from her most recent job, at Arby's, "because of her hostile behavior." [Tr. 219]. Plaintiff further told Dr. Humphreys that "she thinks she could probably handle a job working by herself, such as doing janitorial work. She indicated the main issue is not having people constantly be on to her." [Tr. 219].

Dr. Humphreys diagnosed borderline personality disorder, based in part on "some medical records" brought by plaintiff, and in part on plaintiff's self-report. [Tr. 221]. Dr. Humphreys also diagnosed panic disorder and depression, based on plaintiff's self-report. [Tr. 220-21]. Diagnosing cannabis dependence "that is in sustained partial remission[,]" Dr. Humphreys opined that plaintiff "is not responsible enough to oversee the management of her funds given her cannabis dependence." [Tr. 221-22]. Dr. Humphreys concluded

> The claimant appears to be limited in the following ways. First of all, she likely would be markedly limited in her ability to interact appropriately with others given her volatile behavior. For that reason, if she were to work, she would need to work in a job in which she had minimal contact with other people. Second, the claimant likely would be no more than mildly limited in her ability to remember adequately. Third, she likely would be moderately limited in her ability to understand adequately due to her estimated low level of intelligence. Fourth, the claimant likely would be no more than moderately limited in her ability to concentrate and to persist adequately. Fifth, the claimant likely would be no more than moderately limited in her ability to adapt adequately. *The interviewer basically agrees with the claimant*. Specifically, she is best suited for a simple manual-labor job in which she does not have to interact much with other people, such as doing janitorial work at night.

7

[Tr. 222] (emphasis added). One week later, an unidentified medical consultant reviewed plaintiff's file and predicted no mental limitations of more than a moderate degree. [Tr. 224-41].

On October 31, 2003, plaintiff was admitted to Peninsula Hospital following an overdose of pills. Peninsula's records reflect plaintiff's explanation of this incident.

> Information obtained from various sources indicates the patient and her boyfriend were arguing and during which he dared her to take an overdose and she took about 20 tablets of Trazodone 100 mg. The patient states that she was not trying to kill herself, but she wanted to sleep and impulsively took the overdose because of her boyfriend daring her to. . . . She repeatedly states that she did not mean to kill herself and was only trying to go to sleep. . . . She denied any suicidal . . . ideation. . . . There was no suicidal . . . ideation. . . . The patient was denying any suicidal . . . ideation.

[Tr. 315-18] (emphasis added).[2] Following a positive drug screen for marijuana, plaintiff reported that she has smoked marijuana since age 15 and that she "smokes about 7-8 joints everyday." [Tr. 315]. Dr. Arun Jethanandani observed that plaintiff appeared to be "of low average intelligence with intact memory . . . . insightless and emotionally immature." [Tr. 315, 317].

---

[2] Plaintiff nonetheless twice testified at her administrative hearing, obviously under oath [Tr. 370], that the hospitalization was the result of a suicide attempt [Tr. 374, 391] and her counsel echoed that position in oral argument to the ALJ. [Tr. 370]. Counsel has unfortunately repeated this misstatement in her briefing to this court [Doc. 12, p. 5]. *See* Fed. R. Civ. P. 11(b)(3), (c)(1)(B).

IV.

*Vocational Expert Testimony*

Vocational expert James D. Flynn ("Dr. Flynn" or "VE") testified at plaintiff's administrative hearing. The ALJ presented Dr. Flynn with a hypothetical claimant of plaintiff's age, education, and work experience subject to the following limitations: no more than medium work, moderate difficulties maintaining social functioning and concentration, and no frequent interaction with the general public. [Tr. 397]. In response, Dr. Flynn identified jobs that the hypothetical claimant could perform (at the medium, light, and sedentary levels) existing in the local and national economies. [Tr. 398-99]. Dr. Flynn further testified that plaintiff would be unable to work if either: (a) her testimony was fully credited; or (b) if she had "marked" limitations of adaptation and interacting with others. [Tr. 399-400].

Dr. Flynn was questioned by plaintiff's attorney regarding his background and experience with "handicapped individuals." [Tr. 395-96]. Although counsel earlier objected in part to two written reports submitted by other sources [Tr. 368], she raised no objection to the use of Dr. Flynn as a vocational expert. [Tr. 396, 400].

V.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v.*

*Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id*.

VI.

*Analysis*

Plaintiff argues that the ALJ erred by not providing adequate reasons for rejecting the opinions of examining doctors Summers and Humphreys. Plaintiff also contends that VE Dr. Flynn does not possess "the level of expertise necessary . . . in the counseling and placement of handicapped individuals" and thus should not have been used

as the vocational expert in this case.

## A. Examining Sources

Dr. Summers's examinations showed "a mild kyphoscoliosis deformity," and his lumbar x-rays revealed "mild" reactive sclerosis and "mild" degenerative changes. He concluded that plaintiff "has a mild-moderate decrease in range of motion at her lumbar spine. This will affect her ability to bend, stoop, and lift greater than 20 lbs." Dr. Humphreys assessed in part that plaintiff "likely would be markedly limited in her ability to interact appropriately with others given her volatile behavior. For that reason, if she were to work, she would need to work in a job in which she had minimal contact with other people."

As noted, the ALJ concluded that plaintiff is "not fully credible." Specifically, he cited plaintiff's daily activity level as inconsistent with the degree of pain alleged. [Tr. 18]. Also, the ALJ noted plaintiff's sworn testimony that the 2003 Peninsula hospitalization was the result of a suicide attempt, but he discredited that testimony - based on the administrative record - and concluded instead that the overdose in fact occurred "because her boyfriend had dared her and she wished to sleep." [Tr. 16-17].

In explaining why he was assigning limited weight to the opinions of the two examining sources, the ALJ stated, "The undersigned notes that while Dr. Summers limited the claimant to performing light work, it is obvious that the consulting psychologist based his opinion almost entirely on the claimant's subjective complaints (Exhibits 2F and 7F). As

12

discussed elsewhere in the decision, the claimant is not fully credible." [Tr. 18]. The court agrees with plaintiff that this was not a sufficient explanation for the rejection of Dr. Summers's opinion. The ALJ's above-quoted statement appears to contain either a significant typographical error or an omission of several words, as it references Dr. *Humphreys's* near-total acceptance of plaintiff's self-reporting, yet cites exhibits 2F and 7F which are the reports of Dr. *Summers*. [Tr. 3].

No other reason is provided for the rejection of Dr. Summers's opinion (light work) in favor of the opinion of a non-examining source (medium work). The court has reviewed Dr. Summers's reports and finds no indication that he reached his conclusions in blind acceptance of plaintiff's self-reporting. Instead, Dr. Summers was clear that examination and x-rays showed mild or mild to moderate spinal problems which "will affect her ability to bend, stoop, and lift greater than 20 lbs."

Although the ALJ erred in rejecting Dr. Summers's opinion without adequate explanation, the court finds the error to be harmless. The ALJ took alternate VE testimony regarding jobs at both the light and sedentary levels that plaintiff could perform. The ALJ cited that evidence as alternate grounds for denying plaintiff's claim [Tr. 19-20] and correctly noted that plaintiff's activities (swimming, dusting, mopping, vacuuming, and daily cooking, sweeping, and bleaching) were inconsistent with the postural limitations alleged. Therefore, even if the ALJ had adopted Dr. Summers's light exertion restriction, he would still have reached the same ultimate conclusion. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.

1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is a reason to believe that the remand might lead to a different result.").

As for the rejection of Dr. Humphreys's opinion, the ALJ did not err in explaining that "the consulting psychologist based his opinion almost entirely on the claimant's subjective complaints . . . . [T]he claimant is not fully credible." Dr. Humphreys diagnosed borderline personality disorder in part based on "some medical records" that plaintiff brought with her. [Tr. 221]. That diagnosis was otherwise based in part on plaintiff's self-report. Dr. Humphreys's diagnoses of depression, panic disorder, and cannabis dependence "in sustained partial remission" were based wholly on plaintiff's self-report. [Tr. 220-21]. Dr. Humphreys in fact stated that he "basically agrees with the claimant." [Tr. 222].

Plaintiff primarily complains that the ALJ did not adopt Dr. Humphreys's prediction that "she likely would be markedly limited in her ability to interact appropriately with others given her volatile behavior. *For that reason*, if she were to work, she would need to work in a job in which she had minimal contact with other people." [Tr. 222] (emphasis added). The ALJ's hypothetical contained the lesser, but similar, restriction of "moderate difficulties maintaining social functioning and . . . . should avoid frequent interaction with the general public." [Tr. 397].

14

The court again notes that Dr. Humphreys's "marked limitation" was based on plaintiff's self-report of "volatile behavior" resulting in job terminations.

> She said she has been fired from all of her jobs (except for temporary work jobs) either because of her hostile behavior or her not catching on quickly enough to what she was expected to do. The claimant's last employer was an Arby's restaurant. *She worked there briefly before being fired in August of last year because of her hostile behavior.*

[Tr. 219] (emphasis added). While the administrative record documents a wealth of "volatile behavior" in plaintiff's personal relationships, she testified *under oath* that every job termination resulted from poor performance rather than "volatile" or "hostile" behavior. [Tr. 375-78]. Particularly probative is her testimony pertaining to the Arby's termination, which sharply contrasts with the information she reported to Dr. Humphreys (upon which Dr. Humphreys's assessment was based).

> Q: Now, you were at Arby's for three months . . . . Did you quit, or were you fired?
>
> A: I was fired
>
> Q: And what caused you to be fired?
>
> A: I was hired to be a cashier, and they made me go in the back to do the sandwiches, and I couldn't catch on. I didn't know anything about the sandwiches, and they called the orders to you, and it's remembering all the sandwiches and not knowing how to do it, and they fired me.
>
> Q: Did you have any conflicts when you were working there, any kind of disagreements with your supervisor or with the people that you worked with?
>
> A: No.

Q: And it was basically not being able to keep track of things in the job that caused you to be fired?

A: Yes.

[Tr. 375-76].

Assuming that plaintiff in fact told the truth in her sworn testimony, Dr. Humphreys's conclusions were therefore based on plaintiff's misrepresentations and were correctly rejected by the ALJ. The court has reviewed the administrative record and the reasons given by the ALJ for finding plaintiff to be "not fully credible." The court agrees with the ALJ's reasoning. If anything, the ALJ understated plaintiff's lack of credibility. In addition to the credibility issues already discussed, the court makes the following observations:

> 1. Plaintiff testified that she experiences one to two 30 minute panic attacks daily, at which times she cannot function "at all." [Tr. 390]. However, she also testified that while working at Arby's - for three months at forty hours per week - she was admittedly able to self-manage her anxiety and frustration with short unscheduled breaks. [Tr. 375, 384-85].

2. Plaintiff testified that as a teen "I wasn't violent like fighting" but rather was merely "verbal." [Tr. 372]. At her October 2003 Peninsula intake, plaintiff "denie[d] any history of violence and denie[d] any history of legal problems." [Tr. 320]. However, she told Dr. Humphreys that at a young age she began "hitting people," "was a violent teenager," was "kicked out" of many group homes due to "her violent behavior," and was "arrested for assault and battery" as a teen. [Tr. 218]. The records of the Whitington Group Home show that plaintiff at age 14 was placed in a youth shelter because of "kicking and hitting" another resident. [Tr. 259]. At age 15 she "physically attacked her house parent[.]" [Tr. 267].

3. In June 2001, nurse Henighan noted plaintiff's self-report that "[s]he has

been taking her meds she says, for both blood pressure and diabetes." [Tr. 148]. Nine months later, however, plaintiff informed Dr. Mistry that "[s]he never took the [diabetes] medication, but never admitted not been taking [sic] to Richard Henighan." [Tr.149].

4. On her Activities of Daily Living Questionnaire, plaintiff told the Commissioner "No" in response to the question "Do you use drugs?" [Tr. 96]. Similarly, in November 2000, plaintiff denied to the Knox County Health Department any drug use currently or in the past. [Tr. 162]. However, a drug screen one month later returned as "high positive" for marijuana. [Tr. 172]. Then, in March 2002, she told the health department that she uses one ounce of marijuana per month [Tr. 149], but in May 2002 told the health department that she does not use marijuana. [Tr. 143]. In another version of the story, she told Dr. Humphreys that she began smoking marijuana regularly at age 15, and that she has tried cocaine and crack. [Tr. 219]. Finally, following another positive drug test, she admitted to Dr. Jethanandani in October 2003 that she has smoked marijuana since age 15 and that she "smokes about 7-8 joints everyday." [Tr. 315].

The myriad misstatements and contradictions cited throughout this opinion portray a claimant whose self-reporting and testimony cannot be believed. Because Dr. Humphreys's assessment was based primarily on plaintiff's unreliable self-reports, the ALJ did not err in rejecting that assessment.

> [A]fter listening to what [plaintiff] said on the witness stand, observing his demeanor, and evaluating that testimony in light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [plaintiff] was trying to make his symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment. It is a difficult job, and the people who perform it sometimes err. Such errors are obviously difficult for a reviewing court to detect (the reviewing court not having seen the claimant in the flesh), and we will not normally substitute our impressions on the veracity of a witness for those of the trier of fact. ***We would be particularly reluctant to do so in this case, where there seem to be demonstrable discrepancies between what the claimant said on the stand and what the written record shows***.

17

*Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (emphasis added); *see also Nelson v. Comm'r of Soc. Sec.*, No. 05-5879, 2006 WL 2472910 (6th Cir. Aug. 28, 2006) (ALJ reasonably found plaintiff's credibility to be "less than complete," in part because plaintiff grossly misstated his level of marijuana abuse.).

Lastly, the court notes that Dr. Humphreys's assessment was based partially on his diagnosis of "Cannabis dependence, sustained partial remission" (which was in turn based on plaintiff's underreporting of her drug use). [Tr. 219-23]. It takes little imagination to conclude that plaintiff's extraordinary marijuana consumption affects the abilities viewed as mildly to moderately limited by Dr. Humphreys - concentration, memory, comprehension, persistence, and adaptation. "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).[3]

In sum, the ALJ erred in only one aspect of his residual functional capacity conclusions. That error (medium work versus light work) is deemed harmless. The ALJ's conclusions were in all other respects supported by substantial evidence and will be affirmed.

---

[3] Further, to the extent that plaintiff seeks to rely on low Global Assessment of Functioning ("GAF") scores assigned by various sources, the court notes that those assessments were based largely on plaintiff's drug addiction and/or her unreliable self-reporting. [*See, e.g.,* Tr. 322]. For this reason, the GAF scores are of minimal importance. *See generally DeBoard v. Comm'r of Soc. Sec.*, No. 05-6854, 2006 WL 3690637 (6th Cir. Dec. 15, 2006).

B. <u>Dr. Flynn</u>

Plaintiff also argues that the ALJ erred by using Dr. Flynn as the vocational expert, because Dr. Flynn allegedly does not possess "the level of expertise necessary . . . in the counseling and placement of handicapped individuals." However, despite questioning Dr. Flynn at length regarding his experience, plaintiff's counsel did not object to the use of Dr. Flynn as a vocational expert. The objection is therefore waived. *See Yopp-Barber v. Comm'r of Soc. Sec.*, No. 02-1628, 2003 WL 192121, at *2 (6th Cir. Jan. 27, 2003)*; Jones v. Comm'r of Soc. Sec.*, No. 96-2173, 1997 WL 413641, at *3 (6th Cir. July 17, 1997).

The final decision of the Commissioner will be affirmed. An order consistent with this opinion will be entered.

ENTER:

       s/ Leon Jordan      
United States District Judge